Good afternoon. May it please the court, my name is... You didn't have to emphasize the afternoon part. My name is Rebecca Smith and seated at council table with me is my co-counsel, Timothy Bechtold, and together we represent the appellant Sharon J. Hapner, Alliance for the Wild Rockies, and the Native Ecosystems Council in this matter. Before I begin addressing the issues, I'd like to just set out what the appellants believe are the two key background facts to keep in mind when reviewing this case. And the first is that this project area has undisputedly been subject to a lot of previous log-in and road building, and as a result there is still a legacy of that past environmental damage in this area that has never been remediated. And the second background fact is that this project area is going to continue that pattern. There will be additional environmental degradation from this project, and the Forest Service admits that 87% of the required remediation for this project alone has no secured funding. And so that's an important backdrop for this project. And then with that I'd like to move on. First I'd like to address the current status of this project, the timber sale portion of it. Second, I'd like to address just the three main NFMA arguments regarding elk habitat and old growth habitat. And finally, touch on the NEPA disclosure issues specifically regarding climate change. I'd like to reserve about three minutes for rebuttal if I could, and there will be a couple issues that I probably won't have time to address. And so if the court – Talk fast. Okay. Could you briefly address the motion for clarification? What needs to be clarified? Your Honor, in that motion, the motions panel found that Hafner showed a high likelihood of success in the merits, but at the oral argument the panel expressed concern that because the project is intended to reduce the intensity of wildfire, that people who live in this area, it would affect them evacuating the area essentially if some of these logging units didn't go forward. And so then the motions panel issued a partial injunction in joining about half the timber sale and saying that the logging units along the roads could go forward. But it gave the specific numbers. Of acreage. Right. And the unit numbers, didn't it give the unit numbers? No. No, it didn't. It didn't actually list the units that it had enjoined and the units that were allowed to go forward. And so that's why Hafner filed a motion for clarification, requesting that the court actually list the units that were enjoined and list the units that could go forward, because it's our position that there is a miscommunication about which units are actually along the evacuation routes and which units are not. And the Forest Service has interpreted the injunction order to allow them to do over 400 acres of logging, none of which is along the public evacuation routes. And there's two specific units, C and H, that are the only units along the evacuation routes, and they are the only units intended to protect the evacuation routes. And those aren't the units the Forest Service has sold in a timber sale, which might now be beginning right now as we speak. So that was the... So the sale has been done, but you're not sure whether the actual logging has begun. You say might. That's correct, Your Honor. Maybe the Forest Service can tell us. The units say the winter logging units, and then the winter logging units are identified. So it's A1, B, D, all of the winter logging units are identified. So you're saying that the Forest Service is going beyond the units that are identified as winter logging units? Your Honor, well, units C and H are also winter logging units. Essentially most, if not all, of this logging could be winter logging units. And we believe there is a miscommunication at the oral argument on the motion regarding the location of these units. And so that's why we asked for a clarification to specifically lay out which units, because if the court did that, it would need to look at the unit prescriptions, and it could see that only two of these units are actually along the evacuation route. And the alternative, and preferably, we would just request that this court apply the injunction to all the units, just pending this panel's final decision on the merits. The thing that dispirits me a little is it's almost like a motion for reconsideration. And it doesn't appear that there's a blatant lack of clarity. So that's why I wanted to ask. But I want to take more of your time. Okay. Thank you, Your Honor. And so I just have briefly touched on it, but the Forest Service did award this timber sale contract just last week. And so at this time, appellants are not aware if login has started yet or not, and the Forest Service could probably provide more information regarding that. But in light of the imminence of the login, we would actually request that the court apply the injunction to all of the units and amend that injunctive order pending this court's final decision on the merits. I'd like to start just by addressing the substantive NIFMA issues. First, the elk hiding cover issue. This issue raises a fundamental principle of administrative law, and that is that when a reviewing court reviews an administrative record decision, it has to look at the agency's order and the rationale presented by the agency in its final decision as to why that decision complies with the law. And so any rationale presented in litigation by the Forest Service's counsel is entitled to no deference if it's not actually found in the agency's order itself. And that was the U.S. Supreme Court's holding in the Burlington Truck Lines case cited in briefing. And so the operative document that we have to look at in this case is the final agency order approving the timber sale, and that's the final decision notice. And when we look at the discussion on the elk hiding cover standard in the decision notice, that's in the excerpts of record at 392, it simply says, Forest Plan Standard for Wildlife and Fish, Section 6A.5, maintain hiding cover associated with key habitat components. So the discussion in the agency order doesn't even admit that there is a requirement to maintain two-thirds hiding cover. The agency order completely omitted the quantitative part of that standard and represented that it was just kind of this vague, nebulous thing with no quantitative requirement, when in fact that's a misquotation of the forest plan. We know that the actual forest plan standard, which is at ER 638, actually says maintain two-thirds, at least two-thirds. Now, help me out. I understand what hiding cover means. That is to say, at least I think I understand it, that is to say 90 percent of the individual elk must not be visible from 200 feet or less. I got that part. That's hiding cover. What does maintain two-thirds hiding cover mean? Your Honor, it's the appellant's position that based on the original meaning of the forest plan, that it's two-thirds of a project area. And the way that we have that interpretation is that there is a second relevant elk standard, elk hiding cover-related standard in the forest plan when the forest plan was initially approved. And that standard incorporates the findings of the Montana elk logging study, essentially. And that's something that is cited in the reply brief. And when you look at the Montana elk logging study, they say good hiding cover is two-thirds of the total area. And so that's- That is to say two-thirds of the total area of the project must have enough cover so that if the elk is standing in that area, 90 percent of the elk is invisible from the 200-foot line. That's correct, Your Honor. Okay. Got it. And so you've raised another important issue or touched on it, which is that in addition to the complete failure of the agency order to mention the two-thirds requirement, the agency's order also completely failed to mention that definition. And it completely failed to explain how its hiding cover assessment was applying and complying with that definition. It didn't even acknowledge that there was a forest plan definition of that standard. It seems to me that there's an essential tension between what the Forest Service is trying to accomplish, which is to say they're trying to thin, and they've got, it seems to me, a laudatory aim, which is to cut down on the risk of fire, cut down on the risk of so-called ladder fuel, so that the stuff doesn't climb up and you get a crown fire and so on. That's almost by definition going to reduce cover for the elk. That's correct, Your Honor. Thinning, removing trees. So they've got themselves limited by the forest plan in terms of how much thinning they can do. That's correct, Your Honor, and that is kind of the general idea of forest management, is that we have wildlife protection standards on one hand and then an impetus or a goal to put out commercial timber sales on the other. And the only restrictions on these timber sales like this are these wildlife habitat standards, which might explain why there was actually no disclosure about the two-thirds requirement. Before you even begin this project then, the elk cover was already deficient in the area or not? Your Honor, that's an interesting question because they've never actually assessed elk hiding cover in this project area, according to the forest plan definition. According to the state agency's definition, which is a different definition, but they did use that and they said 62 percent, so that would already fail the two-thirds requirement. We don't even know how much hiding cover there would be under the forest plan definition in this case, but the assumption is due to the past logging, the hiding cover levels have been lowered and that there is no dispute that this project would continue to lower those hiding cover levels. This was sent back once already because of the deficiency of so-called elk mapping? That's correct, Your Honor. Yeah, the elk so far aren't doing very well. That's correct, Your Honor. I'd like to move on, too, to the second substantive issue regarding elk habitat and that is, so the elk hiding cover claim is just related to the project area, but there's also a bigger elk habitat issue, which is that the Forest Service admits that the most important factor affecting degrading elk habitat is road density and the forest plan for the Gallatin Forest no longer has any limit on how many roads the Forest Service can build in the forest. And so it's Hapner's position that this case presents a good illustration of why this is also a violation of NFMA, the failure of the forest plan to restrict road density, because if you look at this particular project area, if there was a scientifically supportable standard, the 0.75 road density standard that used to be the standard, in order to proceed with this timber sale, the Forest Service would have had to close 17 miles of roads. And so instead of closing those roads, they simply have deleted the standard. So there's no standard anymore limiting road density anywhere in the forest for elk. Your Honor, I have only three minutes left. I'd like to reserve my time for rebuttal, if that's all right. Okay, fine. Thanks. Please report, Your Honors. My name is Brian Toth from the Department of Justice for Federal Defendant's Appealese. At the council table with me is Mr. Ron Opsahl for Defendant Intervenors. I intend to take 12 minutes and leave Mr. Opsahl three. First, to address the status of the contract, on January 25th, the Forest Service offered the contract to the prospective high bidder. The high bidder has 30 days from January 25th to get back to the Forest Service and accept. Otherwise, it's rejected out of hand. I see. So the offer's been made. The acceptance has not yet come in. Is that where we are? That's correct, Your Honor. And with the acceptance, we would expect a plan of operations, which would indicate when they intend to log, whether they intend to log this season or not. We haven't received that yet. Okay. So, in fact, no cutting has taken place at this time. That's my understanding. Okay. And to be clear, the scope of the contract was for the winter logging units. It wasn't for anything that was prohibited by the stay order. Whatever that stay order meant. Correct. Okay. So, in your view, are the winter logging units A1, B, D, G, and I? Yes, Your Honor, I believe so. And if you add the acreage up in those units, does it total the 435 units that's referenced in the stay? It should. Yes. You haven't done it? I did when I responded in the motion to clarify. And did it? Yes, it did. Units C and H are hand-treatment units, although it's true that they could be operated during any part of the year, including the winter. They're not units that are restricted to the winter. I'm not sure I want to give away all of our internal procedures, but I will say that this panel tried to get the original motions panel to look at this motion for clarification, and they said, no, it's your case. But I'd like to get some sense as to what was in front of that motions panel as they entered that sort of partial order or partial injunction as to what they were trying to protect. So I'm trying to figure out what was the urgency or the emergency or the public safety at issue that that motions panel thought, well, maybe we should let some of this go forward. What are we talking about? Our understanding, Your Honor, the winter logging units can only operate between November 1st and April 30th. So if at some point, if they're enjoined during that season and sufficient time passes, they won't get to start up again until next winter. Correct. So if they're going to have a chance of going forward at all this season, it was important that we prevail on that injunction. So I, without, on that motion. But there sounds as though there was some public safety escape route road rationale for this. Can you help me out on this? There are hand treatment units that are located along designated public evacuation routes, and the purpose of those treatments in part is to improve the ability of residents to get in and out of the area. Now, I assume the roads are unobstructed. When you say you're trying to make it easy to get in and out, are you trying to reduce the fire danger alongside the road? Is that what we're talking about? That's correct. And my understanding is the roads in some instances are one way in, one way out. Yes. So if there's any part of the area that needs fire reduction, it's the public safety evacuation routes. But what kind of cutting are we talking about? I mean, are we cutting back, you know, half a mile from the road in order to reduce the fire danger? Are we talking about 100 yards? Are we talking about clearing out the wind? What's going on here? I don't know offhand, Your Honor. There are maps attached to our response in the motion for clarification, and it shows the geographic placement of the units. Okay. But maybe this was my last question on this point. There's nothing in the recent history that's changed the fire danger that is to say, I mean, we've got the same amount of danger we had this year as we had two years ago as we had three years ago. I mean, I'm trying to figure out if there's some particular urgency to doing logging to protect the access and egress routes. I can't speak to whether the urgency has increased. It certainly hasn't decreased because the service hasn't been able to get in and operate the project. I mean, there's always a presence of danger to structures within a forest area. I understand that. Perhaps defendant interveners can address that. Okay. Turning to the issue of elk cover, page 173 of the record. Counsel referred to page 392 of the excerpts of record. That's from the original decision notice. As you mentioned, it went back on. I'll remand for a limited issue. I'm sorry. You're referring me to a particular page? This is the excerpts of record, page 173. Okay. And where on that page are you sending me? This is about halfway down. Okay. Where it says forest plan standard for wildlife and fish, page 2-18, section 6A5. This is the paragraph, the analogous paragraph in the operative decision that counsel is referring to. And it references the provision of the forest plan by paragraph section number. And although it doesn't specify that two-thirds is the requirement there, it does specify that hiding cover was estimated at approximately 70-90% of the area and is not limited. What does that mean, 70-90% of the area? What area? They used the timber harvest compartment, which is a management area for timber harvest. It's approximately 17,000 acres and encompasses the areas that would be treated here. But that says hiding cover was estimated at that. So where is the requirement as to what the requirement is for hiding cover? It's in the forest plan. It's not reproduced here. If the Forest Service had to reproduce every single provision of the forest plan that it had to comply with verbatim in its decisions, it would be. But if it's one that's an issue, then it should be part of the record. Understood, Your Honor. To be candid, I can appreciate the confusion about the Forest Service's rationale regarding elk hiding cover here. It's a confusing record. However, any way you look at it, it shows there is enough hiding cover for elk. I don't know that I know enough to say that. The thing I would need to have before me to make the determination is, what is the requirement in the forest plan for retention of hiding cover for elk, and how much hiding cover is there? Then I can make the decision as to whether or not the Forest Service has complied with the requirement in the plan. But from what I have here, I don't think I can make the decision as to whether or not there's been compliance because I don't have my base number that I need. Page 638 of the excerpts of record is the forest plan. And paragraph 5, that's 438. Let me get there. Absolutely. Okay, I'm there. If you go down to paragraph 5, about a third of the way down, it says, maintain at least two-thirds of the hiding cover associated with key habitat components over time. And then it goes on to say, subsequent timber sale activity will be allowed after regeneration provides hiding cover. So there's the two-thirds of the hiding cover. Now that looks like it's, I'm trying to see where that's part of the forest plan. Okay, so the forest plan starts at 630. Okay, so let's see. So maintain at least two-thirds of the hiding cover associated with key habitat components over time. So the parties are disputing several things about this definition. One is two-thirds of what? Two-thirds of what area are we talking about? Another aspect that we're disputing is what's the definition of hiding cover that the Forest Service can use? I'll focus first on the geographic area question. This standard is very different from the standard that was at issue in the other Native Ecosystems Council case involving elk habitat, involving the Elkhorn Project. There was a different standard from a different plan. This is the Helena plan. And there, and we pointed this out in our brief, the plan said, elk summer range will be maintained at 35% or greater hiding cover and areas of winter range will be maintained at 25% or greater thermal cover in drainages or elk herd units. So there it specified a geographic unit that you could use. Now where is, where was that? This is from 418F3rd at 961. This is another case. Another forest plan. Another forest plan. Right. But you're required to abide by this forest plan. Correct. So why is that relevant? I'm trying to contrast the construction of the forest plan in that case with the paragraph issue here, which is different from Native Ecosystems Council. There it specified a geographic area. Here, if you look at the standard, it does not do that. It says maintain at least two-thirds of the hiding cover. I would assume, just reading this, it means a hiding cover that's in the forest. That's our interpretation. That's in the forest plan, but not as it continues to decrease. Absolutely. On the base date when this forest plan was put into effect, I'm thinking that there was a number, there was sufficient, there was cover, a certain acreage of elk cover. Correct. And so at all times, it has to be two-thirds of that. That's how I would read that. I understand. We're not suggesting, and my opposing counsel mentions in their brief, that the Forest Service thinks it can continue to diminish to basically zero, the hiding cover, because if it goes in and assesses two-thirds of whatever's there, every time it's going to be less. That's not our position. Let's just say, for simplicity, if the hiding cover as of the date this forest plan was adopted was 100 percent, then you would have to maintain, the way I read this, 66 and two-thirds percent of elk hiding cover at a minimum at all times. Is that how you read that? That's correct. Okay. What we don't have in the record, what was in 1985 or whenever the plan was adopted, how much elk hiding cover was out. Well, how would you know whether or not you maintained it if you don't know how much was there? What we do know is what's there when we first enter the area. This area, it's true, was logged when it was previously in private ownership, but to my understanding it has not been logged by the Forest Service since this plan was adopted. Well, then let me ask you this. If at the time you entered it was already out of compliance with the forest plan, then what do we do then? I mean, are you not able to log there until the hiding cover has regenerated? That would be the implication, but I want to point the court to the supplemental excerpts of record 75 where the Forest Service makes clear that the majority of stands have regenerated and conifers are densely stocked. That, in my mind, assures the court and it assures the public that if there has been prior logging before the forest plan, those stands have regenerated and the service can go back in there and reduce elk hiding cover. You said SCR 75? Yes. Now, what language am I looking at? Many of the National Forest Land Regeneration Harvest Acres? What am I saying? I apologize. I don't have that page exactly with me. The majority of the stands have regenerated. There's some language to that effect. The majority of these harvested acres have regenerated and many are densely stocked with young conifers, but that's not hiding cover. Hiding cover generally is more mature foliage, right? Well, the trees have to regenerate at some point and young trees is what you're going to get after it's been cut. I would like to give the balance of my time to intervene. We'll make sure he gets his time. This is public matter to me. Okay. I want to keep talking. We won't cut him off. Don't worry. Relax. It's okay. I want to emphasize here that elk, as I think the court mentioned, elk are doing fine. Elk populations are doing very well, but that's not the issue. I understand. I understand. The Forest Service has to comply with the procedures as well as the substance. I'm with Judge Rawlinson here. I'm trying to figure this out and I'm having trouble. Can I come back to ER 173? This is, I guess, the record of the decision where we're talking about hiding cover was estimated at approximately 79% of the area and is not limited. Who made that estimate and what does this mean? This is totally incomprehensible to me. Understood. I have to point the court to you. Understood. You mean it's incomprehensible to me? Is it incomprehensible to you too? Your Honor, I understand the confusion that you're having with this record. It's a difficult record. It's difficult to penetrate the Forest Service's reasoning. Tell me as best you can what this means. Yes. What they did, and I'm looking, I'm not looking at it, but I have the reference to Supplemental Excerpts of Record 248. They estimated the different- No. SCR 248 is going to help me on this? You think? I hope so. If not, I have another. I guess we'll find out. Hang on. Okay. SCR 248. There is so much paper in this. Killing trees. I apologize. To save trees. Yeah. SCR 248. So this is a set of tables. Hang on. I'm still turning. Okay. I'm there. Okay. This is a set of tables breaking down the different classes of vegetation, or trees if you will, on the forest. What the Forest Service did was add up all the different classes with the exception of seedlings and saplings and arrive at 70% roughly. Where's 70%? Where do you see that number? If you add pole, mature, and old growth, you get 73%. So this says structural stage amounts after treatment. That's the table. That's correct. And so what does structural stage amounts mean? These are the different vegetative classes that are going to be treated by the project, ranging from the largest diameter trees and most densely developed class of old growth all the way down to smaller trees, seedlings and grasses. How does that translate to what comprises elk hiding cover? Roughly speaking, an elk is going to be hid by some type of vegetation. The Forest Service approximated elk hiding cover by adding up the classes that would most approximate the trees that elk would be hidden by. You don't mean trees, you mean vegetation. Vegetation, including trees. Of course. Now, so this is a big jump, but this is where the 70% to 90% number is coming from? It's also- SCR-248? This is the basis for it, but it's mentioned expressly in ER-414, and I apologize for having to jump around. It's in our brief, but I realize it's- It would be nice if, when they were discussing the elk hiding cover, that there was a nice big page or two that encapsulated all of this so that we could see that the analysis had been done. I'm on page ER-414. What's that telling me? It's got the same numbers about Polomotor and old growths. I mean, it should, and it's attached to a different acreage, but okay. If the elk had the hiding cover that the analysis does, we wouldn't have to worry about them as much, I think. Yeah, this is the same- It's at the same table. It's the same table. I have everything right in front of me. Here's my problem, or at least my initial problem with using this. A mature forest or just poles or old growth, as I'm sure you know, has relatively little undergrowth. A young forest has lots of stuff on the ground, and elk- I mean, this is 2 plus 2 is 4- walk around on the ground. So if we're talking about a forest that has old growth, that has poles, mature, that tends to be the kind of forest that doesn't provide much cover. The kind of forest that provides cover is a forest with a lot of underbrush. So for you to add up the numbers from pole, mature, and old growth without further explanation and tell me that's providing the cover for the elk, that just doesn't make sense to me. I don't know what else to say, except that elk wouldn't be doing as well as they are on the landscape if they weren't getting some sort of protection from the vegetation. That's a different question. Very well. But, so, is this the only explanation you have as to where the 70 to 90 percent number comes from? Yes. Oh my goodness. Your Honor, in addition to this, I want to put that aside for one minute and go to the Montana state standard, the canopy closure standard. This is a standard that- How can we rely on that, though, if we're supposed to be using the Forest Service numbers to determine whether or not the forest plan is being complied with? How can we jump to the Montana numbers? The service relied on the Montana number. It mentioned it. In addition- Is that permissible? Yes. The service often has to work cooperatively with the state. The state is the entity that manages wildlife. Did the forest plan incorporate the state standards? The forest plan didn't. The state interprets elk hiding cover to mean this certain standard of canopy cover. The problem is that doesn't help you unless your forest plan incorporated that state definition. Well, I think these standards, I mean, you can understand, trying to measure 90 percent of an elk at 200 feet, the Forest Service, other than sticking a fake elk out there and determining how much vegetation it takes to cover it, they have to figure out some approximation that's workable. And they do that in the forest plan. That's why they do it. If that's what the Forest Service thought was the appropriate measure, then it puts that out for public comment. People can comment on whether or not they think that's the correct measure, and the Forest Service can make a reasoned decision. But to do it after the fact is a little bit problematic. Well, respectfully, these plans get promulgated every 15 years approximately, and the Forest Service learns through its project decisions what standards are workable and what standards are not. But you can do supplementary. I mean, you can supplement them. It's not like they're written in stone for 15 years. If a problem arises, can't the forest plan be amended? Sure, and it could amend the Forest Service if this were to be remanded, and they found they were not complying with the standard, they could in fact amend the plan to allow this project to go forward. But I don't think that's the case. Well, so far I have to say I am absolutely unconvinced that this plan preserves or gives me any assurance at all that the two-thirds outcover is provided for. I mean, I see nothing in here that convinces me that the Forest Service has done its job. Your Honor. Anything else? I'm going to have to stand on our papers and what I've previously represented to you. I think the answer is there is nothing else. In the event that you conclude that the record is insufficient and the appropriate remedy is remand for further explanation. And in the meantime, I think the appropriate remedy is simply to enjoin the project until you get it right. Is that right? Well, I think you also have to consider the public interest and the different equitable factors that we argued in the motions panel. And what are those equitable factors? Well, it may be an appropriate time for me to allow Defendant Intervenor to address some of those. I'll let him talk too, but I want your view on this. Well, for one, the public interest in addressing the potential risk for crown fire in this area and the public safety as it play, and the counsel's in favor of allowing treatment. This project is designed in an area that's interspersed with private lands. I have to say, while my personal sympathies don't make any difference, I'm quite sympathetic to the Forest Service trying to protect structures by various forms of fending and so on. But, I mean, the law is the law, whatever it is. If the relief from the state, the limited relief from the state, the winter areas were allowed to be logged, would that relieve the anxiety that the Forest Service has about remand? If the winter logging were allowed to proceed. Right. I think that would be acceptable to the agency. But the winter logging would, there's no guarantee at all that the standard about the outcover would be observed, correct? Apart from the arguments in our brief, which, you know, I have nothing more to say on at this point. Because the winter logging would be letting the project go forward in the areas where winter logging is done, and the only thing we have about outcover is what we have here in front of us, which in my own view, I'm not speaking for my colleagues, is it's not enough. Understood. I think you should also have to consider the balance of the injuries and whether the plaintiffs have shown any irreparable harm. If we're speaking about elk, I would ask the court to focus on elk, on harm to elk, rather than some just general interest in preserving old-growth forests. And the record shows that elk are not at all threatened here. You know, I'm not sure it's our place to say they are or are not threatened. I mean, I've got a forest plan that says you've got to preserve two-thirds elk cover, and you're asking me to set that aside because you've somehow managed to convince me that there are a lot of elk hanging around. There may be even more if there were more elk hiding cover. Well, that would be well above what the state would like to see in its management of the population. So, okay. We'll link. Your co-counsel has saved three minutes for you. Don't get your hopes up. It may be longer than three minutes. Thank you, Your Honors. May it please the court. I am Ron Upsall for the interveners. Where to start? The winter logging is 435 acres out of a 23,000-acre total project area that was analyzed. So we're talking about a really small portion here. And where is that winter logging? Where is the winter logging? And particularly, where is it in relation to the roads? I would direct you to my Exhibit A in the briefing on the motion to clarify. The Forest Service Exhibit B is a little closer in view. It's a color map. The whole area is roaded. The plaintiffs have made an attempt to say that these are logging roads, that they're not used to access houses. I would note that on Forest Service Exhibit C to that briefing, it shows the locations of all the houses, one of which is Plaintiff Hapner's, which is on one of these purported logging roads and not an access road to her house. Some of these logging roads have names like First Ave, Second Ave, First Street, and Second Street. So the whole area is roaded. These roads are used to access the homes. My clients are year-long residents. They live on a road that gets them there. It's not a logging road. It's their road. And they want this logging because, in their view, they want the fire danger reduced. What the purpose is is to slow down the rate of spread of the fire, to allow the time to get the people out. It's not to stop the fire totally. It's not to protect their houses. It's to buy them the time. My supplemental excerpts at 28. Maybe this is not in the record. I rather suspect it is not. In Montana, or maybe I'll even say broadly in western forests, how severe is the danger to life of people who have not been able to evacuate in time? I'm not talking about severe danger to structure. Structures are, you know, they are endangered, and sometimes they get burned up. But at least in my kind of, I mean, we get a lot of fire cases. We live in fire country and so on. And my understanding is, in fact, even in areas where the fire moves pretty fast, the people are able to get out in time. Do you have anything in the record that tells us that people have been killed in national forest lands because they were not able to get out ahead of the fire? I don't know that there's anything specifically says, this fire resulted in this many deaths and we're trying to stop that. In this case... We're trying to assess because there's public interest and so on. I'm trying to get from you some numbers that tell me how severe the danger is. If we're not talking about danger to structure, but we're rather talking about danger to life. So, what's the danger? The danger is, right now as it stands, the Forest Service estimates a fire would move through there at one to three miles an hour. I got that part. No, I read that. I'm trying to figure out what's the actual danger of death to people in that area who can't get out in time if the fire moves quickly. Do we have anything in the record on that point? There's things in the beginning of the EA that talks about that it's at a high risk for a catastrophic fire, but no, there's not a specific number that says, if we don't thin these acres, 20 people are going to die. I think I know the answer, but I also want to give this sort of out in the open here. Do we have any historical numbers in terms of numbers of people who have been killed in national forest fires because they were not able to get out in time? Not that I know of in this record. I mean, we could look at the Derby fire that was just nearby that blew up 100,000 acres in a day. I don't wish to minimize the destructive nature of these fires, the danger of these fires, the danger to the firefighters. I mean, these can be catastrophic events, but I'm trying to figure out, because we're being asked to balance equities, okay, what kind of danger is it? If we look at my Exhibit A on that briefing, you will see that there's basically one road that goes in and out, and then it fans out from there. If you have everybody trying to get out on that one road, you're going to create the traffic jam. If you have fire crews trying to come back up in, they're not going to be able to get in, the people aren't going to be able to get out because it's a one-lane dirt road. Got it, okay. I think I put you as far as I can. I mean, I can't give you a number that says if we don't cut it, 30 people will die. Sure, I know, and there's no reason you couldn't. But, okay, your answers have been helpful. But there is definitely a risk, and it's a real risk. We look at the fires that have happened in the past in Montana, this very area. The last major fire of this project area was 150 years ago. So you have 150 years of fire suppression building fuels that when the fire goes, it's going to be big. And you can look at these other fires that blew up, and it's going to be big. The whole point to these projects is just to slow down that rate. I think that's very clear in the record. And I'm quite sympathetic, actually, to the Forest Service trying to do this. Get back at that. Our position is that the 435 acres is the A, 1B, D, G, and I. I have the unavoidable position of being quoted as given those numbers at argument, and that's what I was talking about. And that's the 435 acres? That's the 435 acres, yes. 300 acres is a controlled burn. If the project was, we're going to do a 300-acre controlled burn, and we'll look at this two-thirds of the area argument as hiding cover. That's grass. How do you get two-thirds of the grass as being hiding cover? So that two-thirds of the project is an untenable standard. That's in the forest plan, though. Well, the forest plan actually says two-thirds of the hiding cover associated with key habitat components, and it defines the key habitat components. How do you define that? Are you looking at the entire forest? Is that what you're saying, that you look at the entire forest? Well, you do look at the entire forest because you look at the entire forest for the key habitat components. That's the issue that we got remanded on to begin with. Those areas were mapped. That two-thirds of the hiding cover associated with those areas needs to be maintained. So your point is that allowing this burn to go forward wouldn't compromise the two-thirds hiding cover requirement? Is that your point? My point is that up to 3% is going to be thinned out of a 230,000-acre project area. You know, it's entirely possible that the project here will comply, but my problem is I have no assurance from what's written here in front of me that it will. I'm sure at some point it will comply. Well, I hope it does. Do we go through another fire season and hope that the fire doesn't hit in August because winter logging ends this April, and if they can't start it, they don't start it again until November? So if we're enjoined, we're enjoined until November, and we're going through another fire season. Now, this is totally irrelevant, but I want to say I live in an area in Berkeley, California, where there was a catastrophic fire in which I think over 30 people were killed because of lack of access routes out of the hills and so on. So I'm acutely aware of danger in and out when you've got a severe fire. This is real. On the other hand, the forest plan is real. Our clients are just very frustrated. This project has been trying to push forward for two years. Well, tell them about the Forest Service. Okay. Thank you. I just have a couple points. The first is that Appellant Hafner has also lived in the project area for 30 years, and she has fire insurance for her structure. She clears around her house, and she would immediately follow any evacuation order issued by the Forest Service. And so she is strongly opposed to this project because of the environmental degradation. And I've lived in western Montana for at least eight years, and I've never heard of a person dying in any of the fires that we have there. And if that was an issue, that should have been something that the Forest Service supported its decision with in the record. And, of course, we have no facts in the record regarding danger to human life. I would just also like to touch on really briefly the fact that was kind of skimmed over by appellees, which is that the 435 acres of logging that the court said could go forward in the temporary stay, none of those units are along the evacuation route. You just heard the Intervenors Council say that there's one road that's the evacuation route. None of those logging units are along that one road that's the evacuation route, and I think that's a critical missing link between what the injunction says and what the defendants are arguing is the harm. There's a missing link between that harm because those units are not along the evacuation route. They're actually further back in the forest, and they would irreversibly eliminate elk hiding cover, including, you know, large trees, young trees, old growth habitat. And so I think that's an important point is that those logging units are not along the evacuation route at all. Do you agree that elk hiding cover is mostly low brush? Your Honor, I think that would depend. I think I've seen other forest plans where they say a particular density, regardless of whether it's older forest or younger forest, they look at the density of the trees, and then based on the density, they estimate how far away it could obscure an elk. And so that would kind of be, to me, that would seem to be the same kind of analysis that would be necessary in this case, that the Forest Service would analyze the tree density that exists and the tree density that would be gone after the project in order to determine if it's meeting its forest plan standard for elk hiding cover, which, of course, it didn't do in this case. And the 70% to 90% figure that was addressed, that is all forest area in the whole project area. So any area that has a single tree is included in that 70% to 90%. And, of course, that says nothing about hiding cover because you could have a tree every 20 feet, every 50 feet, and call that forest, but that's not going to provide hiding cover. And so that 70% to 90% was the agency's rationale. That's the only thing we have to go off from the agency's order, and that certainly didn't address the hiding cover definition from their own forest plan. And just, I know this court heard a case a couple days ago regarding an emergency situation determination where there was, the Forest Service wanted to get the logging done very quickly because there was an emergency situation. We don't have... Because they said there was an emergency situation. That's correct, Your Honor. We don't have any kind of emergency in this case. As the court touched on, the wildfire risk this year is no different than it was 10 years ago. It's no different than it was 20 years ago. It's no different than it will be five years from now. There's no significant difference between the years. And I'd like to just close by reading a quotation to the court regarding this principle of reviewing administrative agency decisions from the U.S. Supreme Court. It's 332 U.S. at 195, Securities and Exchange Commission v. Chainery, where the court said, Then the agency's basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action, nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. And I don't think there's another case out there that addresses this case as much as that one does. And with that, I'd like to request that this court reverse the lower court and join the project. Thank you. Okay. Thank all of you for your arguments, and thank you for your patience. We are now in a case of, let me make sure I get this, Hattner v. Tidwell submitted for decision. We're in adjournment until tomorrow morning.
judges: Lasnik, Fletcher W. , Rawlinson